1  Jack Silver, Esq. SBN  160575
   Law Office of Jack Silver
2  Post Office Box 5469
   Santa Rosa, CA 95402-5469
3  Tel.    (707) 528-8175
   Fax.    (707) 528-8675
4  lhm28843@sbcglobal.net

5  Attorneys for Plaintiff
   NORTHERN CALIFORNIA RIVER WATCH
6

7
                    UNITED STATES DISTRICT COURT
8
                    NORTHERN DISTRICT OF CALIFORNIA
9

10
   NORTHERN CALIFORNIA RIVER          CASE NO.  C08-02141 CW
11 WATCH, a non-profit corporation,
                                      **PLAINTIFF'S MEMORANDUM OF POINTS
12                   Plaintiff,        AND AUTHORITIES IN OPPOSITION TO
          v.                           DEFENDANT'S FRCP 12(b)(6) MOTION TO
13                                     DISMISS**

   REDWOOD OIL COMPANY, INC.,
14 and DOES 1 - 10, Inclusive,        Date:      August 28, 2008
                                      Time:      2:00 p.m.
15                   Defendants.      Ctrm:      2 - OAKLAND
   _____/  Judge:     Hon. Claudia Wilken
16

17

18

19

20

21

22

23

24

25

26

27

28
   C08-02141 CW
   PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT'S
   FRCP 12(b)(6) MOTION TO DISMISS

1

# TABLE OF CONTENTS

2

3  TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii - iii

4  STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

5  PROCEDURAL HISTORY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

6  LEGAL ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

7        A.    Rule 12(b)(6) Motion to Dismiss for Failure to State a Claim . . . . . . . . . . . . . . . . . . 4

8        B.    Rule 12(b)(1) Motion to Dismiss for lack of Subject Matter Jurisdiction . . . . . . . . . . . 6

9        C.    Res Judicata Principles Do Not Apply Under the Facts of This Case . . . . . . . . . . . . . . 6

10       D.    The Terms of the Consent Decree Do Not Prevent Subsequent Action . . . . . . . . . . . . . 8

11  CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

-i-

27

28

1

**TABLE OF AUTHORITIES**

2

**STATUTES AND REGULATIONS**

3

RESOURCE CONSERVATION AND RECOVERY ACT

42 U.S.C. § 6901, *et seq* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

4

§ 6928(d)(7)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
§ 6928(a)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

5

§ 6972(a)(1)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3,7
§ 6972(a)(1)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

6

§ 6973(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
§ 6991e(a)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

7

8

40 CFR § 280.30 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3,7
40 CFR § 280.31 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3,7

9

40 CFR § 280.34 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3,7
40 CFR § 280.40 - § 280.44 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3,7

10

40 CFR § 280.50 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3,7
40 CFR § 280.52 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3,7

11

40 CFR § 280.53 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3,4,7
40 CFR § 280.60 - § 280.66 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4,7

12

40 CFR § 280.63(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3,7

13

California Health & Safety Code § 25289 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

14

California Health & Safety Code § 25292. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
California Health & Safety Code §§ 25292.1(a) - (c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

15

California Health & Safety Code § 25292.3(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
California Health & Safety Code § 25292.3(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

16

California Health & Safety Code § 25293 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
California Health & Safety Code § 25295(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3,4

17

18

**CASES**

19

*Antrim Mining, Inc. v. Davis*
775 F. Supp. 165, (M.D. Pa. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

20

*Association of Am. Med. Colleges v. United States*

21

217 F.3d 770 (9th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

22

*Atlantic States Legal Foundation v Tyson Foods*
897 F.2d 1128 (11th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

23

*Cooper v. Bell*

24

628 F.2d 1208 (9th Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

25

26

-ii-

27

28

C08-02141 CW

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT'S
FRCP 12(b)(6) MOTION TO DISMISS

*Conley v. Gibson*
355 U.S. 41, 78 S. Ct. 99, 2 L. Ed.2d 80 (1957) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4,5

*Fusco v. Xerox Corp.*
676 F.2d 332 (8th Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Gilligan v. Jamco Dev. Corp.*
108 F.3d 246 (9th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Green v. Illinois Dept. of Transportation*
609 F. Supp. 1021 (N.D. Ill 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Los Angeles Branch NAACP v. Los Angeles Unified School Dist.*
750 F.2d 731 (9th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Montana v. United States*
440 U.S. 147, 99 S. Ct. 970, 59 L. Ed. 2d 210 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Neitzke v. Williams*
490 U.S. 319, 104 L. Ed. 2d 338, 109 S. Ct. 1827 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Parks School of Business, Inc. v. Symington*
51 F.3d 1480 (9th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Scheuer v. Rhodes*
416 U.S. 232, 40 L. Ed. 2d 90; 94 S. Ct. 1683 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*The Old Timer, Inc., et al. v. Blackhawk-Central City Sanitation District, et al*
51 F. Supp. 2d 1109 (D.C. Colo 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*United Food & Commercial v. City Foods, Inc.*
878 F. Supp. 122 (N.C. Ill 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*United States v. Aceto Agric. Chem. Corp.*
872 F.2d 1373 (8th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Usher v. City of Los Angeles*
828 F.2d 556 (9th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

-iii-

C08-02141 CW
PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT'S
FRCP 12(b)(6) MOTION TO DISMISS

**STATEMENT OF FACTS**

Plaintiff Northern California River Watch ("River Watch") is a 501(c)(3) non-profit citizens' action organization dedicated to the protection and enhancement of the waters of the State of California including all rivers, creeks, streams and groundwater in Northern California.

River Watch has filed two Complaints against Redwood Oil Company, Inc. ("Redwood Oil"). The first of action was filed on October 18, 1999, under the provisions of the Resource Conservation and Recovery Act ("RCRA") for petroleum hydrocarbon contamination from current and former underground storage tank ("UST") and bulk fuel storage and distribution facilities; and the second, filed on April 24, 2008, the current action, for current and ongoing violations of RCRA following the termination of the prior Consent Decree. Although both Complaints involve violations of RCRA, the specific violations of RCRA differ as do the sites of the violations. With the express termination of the Consent Decree on November 1, 2007, River Watch was free to file against Redwood Oil for current and ongoing violations of RCRA because the Consent Decree had not precluded that possibility.

**PROCEDURAL HISTORY**

Nearly 10 years ago River Watch provided Redwood Oil with Notice of Violations and Intent to File Suit letters ("Notice Letters") for violations of the Clean Water Act ("CWA") and RCRA. The CWA Notice Letter alleged violations of the Act's storm water regulations. The RCRA Notice Letter alleged violations of the RCRA for Redwood Oil's handling and storage of petroleum products which had become an imminent and substantial endangerment to human health and the environment.

Resulting from these negotiations, the parties, including Redwood Oil and defendants Peter Van Alyea and Robert I. Barbieri, entered into a Consent Decree which provided for a schedule of specific remediation work at the listed UST sites with oversight to be retained by supervising Federal, State or local lead agencies. [Court Doc # 11-2 - Dec. of Peter Van Alyea - Ex. A]

The Consent Decree required Redwood Oil to comply with the State Water Resource Control Board's requirements, including the filing of a comprehensive SWPPP for its facilities. In accordance with the Consent Decree, the Court was to retain jurisdiction following the date of termination of the

1    Consent Decree, for the purpose of its enforcement.  The Consent Decree was scheduled to terminate

2    as to all of its provisions on November 1, 2007. [Court Doc #11-2, pg 9]

3        On February 12, 2007, prior to the termination of the Consent Decree, River Watch sent a letter

4    to Redwood Oil,  Defendants Peter Van Alyea and Robert I. Barbieri requesting copies of the "schedule"

5    required by the Consent Decree, copies of relevant documents regarding the remediation plans of each

6    UST site listed in the Consent Decree, copies of the Storm Water Permit, copies of correspondence from

7    the Regional Water Quality Control Board or lead regulatory agency staff regarding each listed site,

8    copies of any documentation indicating that any listed site was not in compliance with the General

9    Permit, and a current listing of the present owners or lessees of each service station or UST site listed

10   in the Exhibits to the Consent Decree. [Decl. of Jack Silver, Ex A at ¶ 2]

11       With a letter dated May 3, 2007, Peter Van Alyea on behalf of Redwood Oil responded to some

12   of the items River Watch had requested in February, providing various documents and anticipated

13   remediation dates for many of the UST sites that remained under the oversight of the Regional Water

14   Quality Control Board or a lead regulatory agency.

15       Based upon River Watch's review of these materials, River Watch found that the State or local,

16   regulatory oversight agency had denied certain closure requests at some of the Redwood Oil UST sites

17   because certain remediation requirements such as plume delineation had not been completed.   In

18   evaluating the remediation work at the sites, it was River Watch's determination at that time that much

19   of the remediation work had not been initiated at many of the sites, and that the provisions and

20   requirements of the Consent Decree had not been met. [Decl. of Jack Silver at ¶ 4]

21       On September 18, 2007, River Watch met with Redwood Oil and Defendant Van Alyea at the

22   Redwood Oil offices in Rohnert Park.  This meeting was ended abruptly after approximately 15 minutes

23   by Redwood Oil's current attorney without any expression of willingness on the part of Redwood Oil

24   to consider an additional agreement or further Consent Decree requiring Redwood Oil to complete the

25   remediation of a number of its sites. [Decl. of Jack Silver at ¶ 3, ¶ 5]

26       On or about the end of September 2007, River Watch sent another letter to Redwood Oil, stating

27   that the documentation earlier provided to River Watch in May had not included remediation

28   C08-02141 CW
     PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT'S
     FRCP 12(b)(6) MOTION TO DISMISS
                                                2

information for 30 of the 57 sites listed in the Consent Decree.   This request was ignored by Redwood

Oil, as was a letter to defendant Robert I. Barbieri in October of 2007 seeking remediation

documentation concerning the UST sites he owned or operated individually, apart from his share of

Redwood Oil ownership.

On or about October 5, 2007 River Watch received a letter from Redwood Oil through its attorney,

Scott Cameron Kirk.   This letter was in disagreement with River Watch's evaluation of the materials

Redwood Oil had provided, and with River Watch's concerns about the extent of claimed remediation

efforts.   The letter also disputed River Watch's continuing contentions of RCRA violations as to the

extent of ongoing contamination at Redwood Oil's UST sites. [Decl. of Jack Silver, Ex B at ¶ 7].

On November 29, 2007, after the termination of the parties' Consent Decree, River Watch served

a Notice of Violations letter upon Redwood Oil with regard to current and ongoing violations of the

RCRA, 42 U.S.C. § 6901 et seq. [Court Doc #1, Ex A]  River Watch informed Redwood Oil that at the

expiration of the appropriate notice period, River Watch intended to commence an action against

Redwood Oil for current and continuing on the following grounds:

1.   Redwood Oil's use and storage of petroleum products at its gasoline station sites
as identified in this Notice has and continues to violate permits, standards, regulations,
conditions, requirements and/or prohibitions effective pursuant to RCRA regarding
storage of petroleum in underground storage tanks ("USTs") [42 U.S.C. §
6972(a)(1)(A)];

2.   Redwood Oil's operations at these gasoline station sites as identified in this Notice
have caused petroleum contamination of soil and groundwater which presents an
imminent and substantial endangerment to human health and to the environment [42
U.S.C. § 6972(a)(1)(B)].     [Court Doc #1, Ex A. pg. 1]

This Notice of Violations  included the following claims which were not contained in the first

Notice of Violations sent to Redwood Oil in 1999:

1.       Failure to prevent a release, in violation of 40 CFR §§ 280.30,  280.31 and
California Health & Safety Code §§ 25292.1(a) - (c), 25292.3(a) and (b).

2.       Failure to properly detect and monitor releases, in violation of 40 CFR §§
280.40 - 280.44 and California Health & Safety Code § 25292.

3.        Failure to properly report and keep records of the release, in violation of 40
CFR §§ 280.34, 280.50, 280.52, 280.53, 280.63(b) and California Health &
Safety Code §§ 25289, 25293 and 25295(a)(1).

1    4.    Failure to take proper corrective action, in violation of 40 CFR §§ 280.53,
          280.60 - 280.66 and California Health  & Safety Code § 25295(a)(1).
2          [Court Doc #1, Ex A. pg. 7]

3    This Notice of Violations made it clear that River Watch alleged each of these failures by

4    Redwood Oil as separate violations of the RCRA for one or more of Redwood Oil's UST sites and its

5    bulk distribution facility. This Notice of Violations was issued in view of Redwood Oil's current and

6    ongoing discharges and releases of petroleum products and petroleum constituents, including chemicals

7    known to the State of California to cause cancer or reproductive toxicity.  As of the date of that Notice

8    of Violations, Redwood Oil had failed to take corrective actions to abate further violations of RCRA.

9    After receiving no response from Redwood Oil during the 90-day notice period, River Watch

10   filed its Complaint on April 24, 2008. [Court Doc. #1] incorporating the Notice of Violations and each

11   of the allegations contained therein

12

13                          **LEGAL ARGUMENT**

14   **A.    Rule 12(b)(6) Motion to Dismiss for Failure to State a Claim**

15   Redwood Oil has filed a Motion to dismiss River Watch's Complaint under the provisions of

16   FRCP 12(b)(6) for the alleged failure of River Watch to state a claim for which relief by the Court might

17   be granted.

18   *Conley  v. Gibson*, 355 U.S. 41, 78 S. Ct. 99, 102, 2 L. Ed.2d 80 (1957) sets forth the general

19   rubric under which complaints may be tested by motions to dismiss:

20       "In appraising the sufficiency of the complaint we follow, of course, the accepted rule
         that a complaint should not be dismissed unless it appears beyond doubt that the
21       plaintiff can prove no set of facts in support of his claim which would entitle him to
22       relief."

23

24   At this stage in the litigation allegations alone will suffice.  The court must take the non-moving

25   party's allegations as true and construe those allegations in the light most favorable to the non-moving

26   party.  *See also Parks School of Business, Inc. v. Symington,* 51 F.3d 1480, 1484 (9th Cir. 1995).  The

27   court must also draw all reasonable inferences in favor of the non-moving party. See *Usher v. City of*

28   C08-02141 CW
     PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT'S
     FRCP 12(b)(6) MOTION TO DISMISS
                                              4

*Los Angeles,* 828 F.2d 556, 561 (9th Cir. 1987).  And, when the non-moving party has attached exhibits to the complaint, those exhibits may be considered by the Court without converting the motion to one for summary judgment.  *Cooper v. Bell*, 628 F.2d 1208, 1210, n.2 (9th Cir. 1980).

The issue is not whether a plaintiff will ultimately prevail, but whether the plaintiff is entitled to offer evidence in support of the plaintiff's claims.  *Scheuer v. Rhodes*, 416 U.S. 232, 236; 40 L. Ed. 2d 90; 94 S. Ct. 1683 (1974); *United States v. Aceto Agric. Chem. Corp.*, 872 F.2d 1373, 1376 (8th Cir. 1989).  "A complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  *Conley*, 355 U.S. at  45-46.  The Rule does not countenance dismissals based on a judge's disbelief of a complaint's factual allegations.  *Neitzke v. Williams*, 490 U.S. 319, 327, 104 L. Ed. 2d 338, 109 S. Ct. 1827 (1989).  It is only in the "unusual case" where the complaint on its face reveals some insuperable bar to relief that a dismissal under Rule 12(b)(6) is warranted.  *Fusco v. Xerox Corp.*, 676 F.2d 332, 334 (8th Cir. 1982).

A Rule 12(b)(6) motion to dismiss for failure to state a claim is viewed with disfavor and is rarely granted. See *Gilligan v. Jamco Dev. Corp.,* 108 F.3d 246, 249 (9th Cir. 1997).

In the instant case, Redwood Oil has not made any claims that the basis for River Watch's current Complaint contains no set of facts which would entitle River Watch to relief, or that allegations made in the current Complaint are identical to and were fully addressed by River Watch's October 15, 1999 Complaint against Redwood Oil – and clearly they are not identical, as is noted above with respect to the violations occurring after the 1999 action and additional allegations contained in the November 29, 2007 Notice of Violations.   In fact, Redwood Oil does not suggest that River Watch's present allegations against it are not justiciable – except that the parties' earlier Consent Decree would, it contends, prevent River Watch from bringing any further Federal action of any kind against Redwood Oil.

This failure in the substance of Redwood Oil's Motion to Dismiss is fatal.  Without establishing that River Watch's allegations in its current Complaint are identical with those covered in its first Complaint against Redwood Oil, and without establishing that there have been no new releases at any

1   of the UST sites, Redwood Oil has not met its obligation for purposes of a FRCP 12(b)(6) motion to

2   dismiss.  It is not enough to simply announce, as Redwood Oil has, that "… the Order entered in 2000

3   has the full force and effect of *res judicata*." [Def's Memo of Points and Authorities, p. 3, lines 15-16]

4   **B.      Rule 12(b)(1) Motion to Dismiss for lack of Subject Matter Jurisdiction**

5          Pursuant to Rule 12(b)(1), a district court must dismiss an action if it lacks jurisdiction over the

6   subject matter of the suit.   In order to prevail the party moving under Rule 12(b)(1) must submit

7   evidence indicating that the court lacks subject matter jurisdiction. Once the moving party has submitted

8   evidence supporting its motion it " then becomes necessary for the party opposing the motion to present

9   affidavits or any other evidence necessary to satisfy its burden of establishing that the court, in fact,

10  possesses subject matter jurisdiction." *Association of Am. Med. Colleges v. United States*, 217 F.3d 770,

11  778 (9th Cir. 2000) (noting that a district court "obviously does not abuse its discretion by looking to

12  this extra-pleading material in deciding the issue, even if it becomes necessary to resolve factual

13  disputes").

14         It is unclear from Redwood Oil's Motion to Dismiss if it is alleging lack of jurisdiction due to

15  either the prior Consent Decree that terminated as to all of its provisions on November 1, 2007, or its

16  theory concerning res judicata.   However, as discussed  below, neither is applicable nor can either act

17  to deprive this Court of jurisdiction over River Watch's claims.

18  **C.      Res Judicata Principles Do Not Apply Under the Facts of This Case**

19         The elements necessary to establish res judicata are well settled.  In *Montana v. United States*,

20  440 U.S. 147, 153, 99 S. Ct. 970, 59 L. Ed. 2d 210 (1979), the Court held that under res judicata, a final

21  judgment on the merits bars further claims by parties or their privies based on the same cause of action.

22         River Watch contends that res judicata does not apply to preclude its current litigation against

23  Redwood Oil because River Watch's present claims do not meet one of the three necessary requirements

24  for res judicata application.  River Watch's allegations of Redwood Oil's  RCRA violations do not meet

25  the primary res judicata requirement that the same claim or cause of action be present in the subsequent

26  action that is sought to be dismissed.

27

28  C08-02141 CW
    PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT'S
    FRCP 12(b)(6) MOTION TO DISMISS
                                            6

1    As discussed above River Watch raised claims in the November 29, 2007 Notice of Violations

2    made part of the 2008 Complaint which were not raised in the 1999 complaint. In addition to alleging

3    current and continuing violations of 42 U. S.C. §§ 6972(a)(1)(A) and (B), the 2008 Complaint alleged

4    categorical violations not alleged in the 1999 Complaint: failure to prevent a release, in violation of 40

5    CFR §§ 280.30 and 280.31; failure to properly detect and monitor releases, in violation of 40 CFR §§

6    280.40 - 280.44; failure to properly report and keep records of the release, in violation of 40 CFR §§

7    280.34, 280.50, 280.52, 280.53, 280.63(b); and, failure to take proper corrective action, in violation of

8    40 CFR §§ 280.53, 280.60 - 280.66. [Court Doc. #1, Ex A, pg. 7]

9    With every new violation of "permits, standards, regulations, conditions, requirements and/or

10   prohibitions effective pursuant to RCRA" there is a distinct primary right that is being infringed upon

11   under the provisions of the RCRA.   Each new day of non-compliance with the statute is deemed to

12   constitute a new violation.  *Atlantic States Legal Foundation v. Tyson Foods* 897 F.2d 1128 (11th Cir.

13   1990) at 1138-39 [*see also* 42 U.S.C. § 6928(d)(7)(B), 42 U.S.C. § 6928(a)(3), 42 U.S.C. § 6973(b) and

14   42 U.S.C. § 6991(e)(a)(3) all specify penalties for each day of violation.]

15   In its 2008 Complaint, River Watch alleged new violations of the RCRA and current conduct on

16   the part of Redwood Oil that, if proven, would render it liable for penalties under RCRA provisions.

17   River Watch is complaining of continuing and subsequent violations of the RCRA occurring after the

18   termination date of the Consent Decree.   Accordingly, River Watch's current claims cannot be deemed

19   the "same claims" as it brought in 1999.

20    Res judicata "does not bar litigation of claims arising from transactions which occurred after the

21   [original] action was brought."  *Los Angeles Branch NAACP v. Los Angeles Unified School Dist*., 750

22   F.2d 731, 739-740 (9th Cir. 1984). River Watch has alleged claims which have arisen since the earlier

23   action was filed, and it is these claims for which River Watch seeks redress under the provisions of the

24   RCRA.

25   Numerous other courts have also held that new violations give rise to new claims and that

26   defendants do not enjoy a general immunity against these new claims. (See *The Old Timer, Inc., et al.*

27   *v. Blackhawk-Central City Sanitation District, et al*., 51 F. Supp. 2d 1109, 1118 (D.C. Colo 1999) (each

28   C08-02141 CW

permit violation gives rise to a separate cause of action, and res judicata bars only those violations covered by the penalty order); *Antrim Mining, Inc. v. Davis*, 775 F. Supp. 165, 172 (M.D. Pa. 1991) (each new day of violation gives rise to a new cause of action under the statute); *United Food & Commercial v. City Foods, Inc.*, 878 F. Supp. 122, 123 (N.C. Ill 1995) (a defendant's continuing course of conduct, even if related to conduct complained of in the earlier lawsuit, generally creates a separate cause of action; *Green v. Illinois Dept. of Transportation,* 609 F. Supp. 1021, 1024 (N.D. Ill 1985).

The 2008 Complaint of River Watch alleges claims of additional discharges of pollution occurring after the date of the termination of the Consent Decree.  [Court Doc. # 1, pg. 4-8]

River Watch  has alleged different violations of the RCRA than were alleged in 1999, as well as current and ongoing violations by Redwood Oil.  In as much as the Consent Decree does not have prospective effect as to any future statutory violations, Redwood Oil must remain liable for all violations occurring after the effective date of the previous action as well as the new categorical allegations.

**D.    The Terms of the Consent Decree Do Not Prevent Subsequent Action**

The text of the Consent Decree does not preclude River Watch's right to bring another action against Redwood Oil for what River Watch alleges to be current and ongoing violations of the provisions of the RCRA.

Sections 23 and 24 of the Consent Decree state as follows:

23.  This Court shall retain jurisdiction from the date of entry of this Consent Decree through the date of termination of this Decree for the purposes of this Decree.  In addition, following the date of termination of this Consent Decree, this Court shall retain jurisdiction for the purposes of (1) resolving any dispute of this Decree, and (2) disposing of any motion to enforce this Decree, or of any contempt petition, filed on or before the date of termination.

24.  This Consent Decree shall terminate as to each of its provisions on November 1, 2007.  [Court Doc #11-2, pg. 10]

In section 23 of the Consent Decree, the parties specified that "the Court shall retain jurisdiction … *through the date of termination of this Decree*…."  The Consent Decree also specifies that the Court "… shall retain jurisdiction for the purposes of (1) resolving any dispute…, and (2) disposing of any motion … *filed on or before the date of termination*."  (Emphasis added.)

1    The plain meaning of this section of the Consent Decree is obvious. The Court's retained

2   jurisdiction was agreed to conclude with the termination of the Consent Decree, unless a dispute arose

3   or a motion to enforce the Consent Decree was filed on or before the date of termination.

4    Here, inasmuch as there was no formal dispute made during the pendency of the Consent

5   Decree, and no motion to enforce the terms of the Consent Decree was filed before the date of

6   termination, it seems apparent to River Watch that the jurisdiction of the Court ended on November 1,

7   2007; and, that after November 1, 2007, River Watch was no longer constrained by its provisions, and

8   was free to bring a subsequent action against Redwood Oil with current allegations of violations of the

9   RCRA.

10    In terms of the language of the Consent Decree, Redwood Oil may claim that the concerns raised

11   by River Watch in 2007 about many of the Redwood Oil sites, and River Watch's request for

12   remediation information qualifies as a "dispute" within the meaning of the Consent Decree.  Even if it

13   does, Redwood Oil itself was unwilling to consider seriously any of River Watch's concerns,

14   maintaining that it had complied with Regional Water Quality Control Board directives and had been

15   remediating each of the listed sites.  During this period in the latter months of 2007, Redwood Oil was

16   unwilling to mediate River Watch's concerns, and seemed willing to allow the Consent Decree to lapse,

17   apparently believing that unless River Watch brought a motion to enforce before November 1, 2007, it

18   would be timed out with respect to the Consent Decree, and Redwood Oil would be out of jeopardy.

19    The evidence for this interpretation of the reason for Redwood Oil's refusals to negotiate with

20   River Watch regarding River Watch's ongoing concerns about the adequacy of remediation during this

21   time may be found in Redwood Oil's own Memorandum of Points and Authorities, wherein it is argued

22   as follows:

23        But it also believes that River Watch is itself in violation of the Consent Decree and
         Order, and has failed to properly follow the procedures required to enforce the terms
24        of the settlement it made.  Based on these procedural failures, Redwood Oil does not
         believe that River Watch can maintain an action even to enforce the terms of the
25        Consent Decree. (Def's Memo of Points and Authorities, p. 4, lines 5-8.)

26    It is apparent to River Watch that Redwood Oil's interpretation of the effect of the termination

27   of the Consent Decree provided the rationale that led Redwood Oil to resist any further negotiations with

28   C08-02141 CW
PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT'S
FRCP 12(b)(6) MOTION TO DISMISS
9

1   River Watch before the date of the termination of the Consent Decree.  To River Watch, this conduct

2   on the part of Redwood Oil amounts to "unclean hands," which should in itself defeat Redwood Oil's

3   request that the Court should enforce Redwood Oil's self-serving interpretation of the Consent Decree.

4          In September of 2007 River Watch attempted in good faith to bring Redwood Oil to the

5   negotiating table before the termination of the Consent Decree on November 1, 2007.  However, with

6   the abrupt termination of that meeting by Redwood Oil, it became fully apparent to River Watch that

7   Redwood Oil was not interested in mediation under the terms of the Consent Decree, and that Redwood

8   Oil was content to let the enforcement provisions of the Consent Decree lapse. [Decl. of Jack Silver at

9   ¶ 6]

10          It is clear that the text of the Consent Decree is silent about the effect of not bringing a motion

11  to enforce until after its termination.   Nowhere does it state or imply that River Watch will be forever

12  precluded from bringing another action against Redwood Oil.

13          In its integration clause, the Consent Decree states that it "constitutes the full, complete, and

14  entirety of the terms and conditions agreed to by them…." [Court Doc. #11-2, pg 8]  Accordingly,

15  without a written provision in the Consent Decree as to the effect of River Watch's not bringing a

16  motion to enforce, or as to not notifying Redwood Oil in writing of alleged violations leading to an

17  agreement to mediate their dispute, there can be no basis for the claim that no litigation can be filed

18  against Redwood Oil for violations of RCRA provisions.

19                                           **CONCLUSION**

20          On the basis of the foregoing, River Watch believes the Motion to Dismiss filed by Redwood

21  Oil should be denied in its entirety as not being in accord with the manner by which a FRCP Rule 12(b)

22  motion is brought.

23  Dated: August 6,  2008                      Respectfully submitted,

24                                              /s/ *Jack Silver*

25                                         _____
                                            JACK SILVER
                                            Attorney for Plaintiff
26                                          NORTHERN CALIFORNIA RIVER WATCH

27

28
    C08-02141 CW
    PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT'S
    FRCP 12(b)(6) MOTION TO DISMISS
                                                10

1   Jack Silver, Esq. SBN 160575
   Law Office of Jack Silver
2   Post Office Box 5469
   Santa Rosa, CA 95402-5469
3   Tel.   (707) 528-8175
   Fax.  (707) 528-8675
4   lhm28843@sbcglobal.net

5   Attorneys for Plaintiff
   NORTHERN CALIFORNIA RIVER WATCH
6

7

8                 UNITED STATES DISTRICT COURT

              NORTHERN DISTRICT OF CALIFORNIA
9

10

11   NORTHERN CALIFORNIA RIVER    CASE NO.  C08-02141 CW
   WATCH, a non-profit corporation,
12                         **DECLARATION OF JACK SILVER IN SUPPORT**
                Plaintiff,   **OF PLAINTIFF'S OPPOSITION TO**
13         v.                    **DEFENDANT'S FRCP 12(b)(6) MOTION TO**
                        **DISMISS**
14   REDWOOD OIL COMPANY, INC.,
   and DOES 1 - 10, Inclusive,     Date:      August 28, 2008
15                        Time:      2:00 p.m.
             Defendants.    Ctrm:    2 - Oakland
16   _____/    Judge:   Hon. Claudia Wilken

17   1.    I am an attorney duly admitted to practice before all the Courts of the State of California, and an

18   attorney of record herein for Plaintiff NORTHERN CALIFORNIA RIVER WATCH.  I have personal

19   knowledge of all matters stated herein and, if called as a witness, could and would testify competently

20   thereto.

21   2.    Attached hereto as **Exhibit A** is a true and correct copy of the February 12, 2007 letter I sent

22   to Peter Van Alyea, President of Redwood Oil Company and Robert I. Barbieri, Owner of Redwood

23   Coast Petroleum, Inc.

24   3.    On September 18, 2007, James Doyle and I met with Peter Van Alyea, President of Defendant

25   REDWOOD OIL COMPANY, INC., John Mahoney, a Redwood Oil Company employee, and attorney

26   Cameron Scott Kirk at Defendant's business offices in Rohnert Park, California for the purpose of

27   discussing the condition of the many unremediated underground storage tank sites that Defendant

28   continued to own, operate or control at that time.

4.      Mr. Doyle and I had recently prepared an extensive written review of each of these sites, and traveled to Rohnert Park ready to discuss our concerns with management as well as the prospect of entering into a second Consent Decree with Defendant inasmuch as the original Consent Decree was scheduled to terminate in approximately six weeks.  A number of the Redwood Oil sites required further extensive remediation work that had not been completed under the previous Consent Decree.  We believed that another agreement could be entered into that would insulate Defendant from further litigation, and insure the process of underground storage tank site remediation.

5.      Our attempt to discuss these sites was met with disinterest on the part of these gentlemen who were unwilling to discuss any of the sites.  After 15 minutes or so, they thanked us for providing them with a copy of our written review and bid us good day.

6.      In our estimate these men apparently were taking the position that they had complied with the terms of the Consent Decree, that the language of the Consent Decree no longer required Defendant to conduct any further work, and that Northern California River Watch had no further recourse to compel Redwood Oil Company, Inc. to complete any of the remediation work that was the subject of the original Consent Decree.

7.      Attached hereto as **Exhibit B** is a true and correct copy of  a October 5, 2007 letter sent from Cameron Scott Kirk, Counsel for Redwood Oil Company to myself, including its enclosures.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true correct and that this declaration was executed on August 6,  2008, at Santa Rosa, California.

JACK SILVER

C08-02141 CW
DECLARATION OF JACK SILVER IN OPPOSITION TO DEFENDANT'S
FRCP 12(b)(6) MOTION TO DISMISS                                                                    2

# EXHIBIT A

# Law Office of Jack Silver



P.O. Box 5469    Santa Rosa, California 95402-5469
Phone 707-528-8175          Fax 707-528-8675
warriorreco@yahoo.com

February 12, 2007

Peter Van Alyea, President
Redwood Oil Company
50 Professional Center Drive  #100
Rohnert Park, CA  94928-2173

Robert I. Barbieri, Owner
Redwood Coast Petroleum, Inc.
455 Yolanda Avenue
Santa Rosa, CA 95402

        Re: *Northern California River Watch v. Redwood Oil Company*
        U.S. District Court Case No. C 99-04160 WHA

Dear Messrs. Alyea and Barbieri:

As you will recall, in September of 2000 a Consent Decree was entered into between River
Watch and Redwood Oil Company in the above-captioned RCRA action. We are
approaching the 7-year termination date for this Consent Decree which is scheduled to
conclude on November 1, 2007.

Well in advance of that anniversary,  I would greatly appreciate your cooperation in
providing my offices with the following documents and other information so that River
Watch might be able to determine the extent to which your UST sites have been remediated
in the interim:

1.     A copy of the "Schedule" (required by the terms of the Consent Decree) provided to
       the Regional Water Quality Control Board and/or the Lead Agency for purposes of
       setting forth the remediation work plans for each of the sites listed on Exhibit B of the
       Consent Decree.

2.     Copies of relevant documents for each of the sites listed in Exhibit B to the Consent
       Decree which reflect the efforts made by your engineering and/or contractors to
       comply with each of the remediation work plans as specified in the Schedule. (The
       most recent quarterly monitoring reports as well as any current CAPs or RAPs should
       be sufficient as to each of the sites.

Redwood Oil Company
Redwood Coast Petroleum , Inc.
Page 2
February 12, 2007

3.    Copies of the most recent correspondence from Regional Water Quality Control
      Board staff and/or Lead Agency staff with respect to the current status of remediation
      efforts for each site listed on Exhibit B to the Consent Decree.

4.    A copy of Redwood's Stormwater Permit which was implemented with respect to all
      of the bulk facilities and retail sites listed in the Consent Decree.

5.    Any documentation related to any site listed on Exhibit B of the Consent Decree
      which reflects when and for what period of time the site has not been in compliance
      with California's General Stormwater Permit.    (This request covers only
      documentation generated since November 1, 2000.)

6.    A list of the addresses of each service station facility or UST site currently owned by
      Redwood Oil Company.

7.    A list of the addresses of each service station facility or UST site currently owned by
      Redwood Coast Petroleum, Inc.

8.    A current list of the names and addresses of the present owners or leasees of each
      service station facility or UST site listed on Exhibits A and B of the Consent Decree
      which has been sold, leased or otherwise transferred to any third party during the past
      7 years.

Thank you for your help in providing this documentation to us as soon as is reasonably
convenient.

                                        Very truly yours,

                                        Jack Silver

JS:lhm
cc:    Northern California River Watch

# EXHIBIT B

# B|C

**BEYERS
COSTIN**

200 FOURTH ST. SUITE 400  P.O. BOX 878 SANTA ROSA, CA 95402-0878

PHONE 707.547.2000  FAX 707.526.2746  WEB BEYERSCOSTIN.COM

A PROFESSIONAL CORPORATION

October 5, 2007

Jack Silver
Law Offices of Jack Silver
Northern California Environmental Defense Center
11220 Occidental Road
Sebastopol, CA 95472

Re:    Northern California River Watch v. Redwood Oil, et al.
          BC File No.: 5024-03

Dear Jack:

This responds to the various e-correspondence sent recently by your associate James Doyle to my client Redwood Oil Company. This also follows Redwood Oil's detailed response to your letter of February 12, 2007, in these regards, and River Watch's response to same.

Attached for your review is Redwood Oil's response to Mr. Doyle's analysis of the site related documents provided to you by Redwood Oil. As you can see, Mr. Doyle's analysis is incorrect in multiple regards. Our analysis demonstrates that a significant amount of work has taken place at each of the sites on Exhibit B of the Consent Decree, and Redwood Oil is in compliance with the Consent Decree. More than 61,000 tons of contaminated soil have been excavated through the years, and Redwood Oil is working diligently with the environmental agencies to actively remediate the sites. The cost for this work exceeds $14 Million. Mr. Doyle's review of the records appears to have been either blatantly biased or negligently incorrect. In either case, his review has no value. To the extent it is used to support any claim for fees or costs, we will object.

Please provide me with an accounting of your fees and costs as they have been incurred by River Watch through the course of the Consent Decree.

Also, your threat of renewed litigation is wholly unwarranted and unsupported. Redwood Oil performed a lot of work at the sites subject to the Consent Decree, and Redwood Oil works diligently with government agencies. Moreover, your threat of litigation is not supported by the Consent Decree. Please focus your efforts on sites warranting attention. Redwood Oil reserves all rights in these regards.

Very truly yours,

Cameron Scott Kirk

CSK:sb
Enclosure
cc:    Client (w/encl.)

G:\5024-03\LTRS\SILVER LTR 10.5.07.DOC

## REDWOOD OIL RESPONSE TO RIVER WATCH SITE ANALYSIS
### October 5, 2007

1) 101 Cloverdale Blvd, Cloverdale:

---*Site remediation not anticipated until 2019.* **This is an incorrect statement.** In the schedule provided to Riverwatch (RW), **implementation of the CAP/RAP was indicated to commence Nov 2007. No further action and closure is expected sometime in 2019.** CAP/RAP implementation (remediation system installation) is still scheduled for Nov 2007.

---*No active remediation to date.* **This is an incorrect statement.** 550 cubic yards (742.5 tons)* of contaminated soil has been removed via remedial action excavation. RW references the Lawrence Livermore Oct 16, 1995 report noting that pump and treat technologies are generally ineffective at reaching MCL cleanup levels. In the same paragraph the report also states that once the source of fuel hydrocarbons is removed (via soil over excavation) bioremediation processes take over. The report goes on to say that bioremediation processes are as efficient as actively engineered remediation and should be utilized whenever possible. **The U.S. EPA also acknowledges the benefits of soil removal remedial actions. "The best way to reduce the likelihood of groundwater contamination and shorten the time required to achieve remediation objectives is to quickly and completely eliminate the mass of contamination in the subsurface".**[1]

---*SRS/PPS/Aquifer profile.* The SRS was done in 1998 and was referenced in the 2000 CAP sent to RW. This department does not know what a "PPS" or an "aquifer profile" is. If an "aquifer profile" is a geologic cross section it is more likely to be contained in a subsurface investigation report and not a CAP or RAP.

2) 235 So. Cloverdale Blvd, Cloverdale:

---*7 wells w/in 2,000' radius.* **All these wells are documented to be up gradient or cross gradient of the site, not down gradient.** The Sonoma Co. Dept. of Health Service **has never required sampling of these wells** and there has never been any report that they have been impacted with petroleum hydrocarbons (HC's) at any time.

---*No remediation ever initiated.* **This is an incorrect statement.** 1,500 cubic yards (2,025 tons)* of contaminated soil has been removed via remedial action excavation. RW references the Lawrence Livermore, Oct 16, 1995 report noting that pump and treat technologies are generally ineffective at reaching MCL cleanup levels. In the same paragraph the report also states that once the source of fuel hydrocarbons is removed (via soil over excavation for instance) bioremediation processes take over. The report goes on to say that bioremediation processes are as efficient as actively engineered remediation and should be utilized whenever possible. **The U.S. EPA also acknowledges the benefits of soil removal remedial actions. "The best way to reduce the likelihood of groundwater contamination and shorten the time required to achieve remediation objectives is to quickly and completely eliminate the mass of contamination in the subsurface".**[1]

---*Low levels but near sensitive receptors.* The only sensitive receptor possibly threatened by any constituent of concern (COC) is the basement identified across the street from the site. The COC's involved are benzene and MTBE. Both are below MCL's (1 for benzene and 5 for MTBE). In addition, MTBE is not considered a threat to a basement at or below the water table as MTBE does not readily partition out from its dissolved phase and thus does not present an indoor air intrusion health risk.

---*SRS/PPS/Aquifer profile.* The SRS was done in 2001. This department does not know what a "PPS" or an "aquifer profile" is. If an "aquifer profile" is a geologic cross section it is more likely to be contained in a subsurface investigation report and not a CAP or RAP.

1

3) 7716 Old Redwood Hwy., Cotati:

---*37,000 TPHg; 10,000 MTBE noted in onsite well MW3 from 11/30/06 QM report.* **This is a misleading statement.** Concentrations in **May 2007 were 3,400 ppb TPHg and 780 ppb MTBE**.

---*24,000 TBA noted in same report for onsite well MW7A.* **This is a misleading statement.** Concentrations in **May 2007 were 5,100 ppb**.

---*No active remediation at the site at any time.* **This is an incorrect statement. 2,200 cubic yards (2,970 tons)\* of contaminated soil has been removed via remedial action excavation.** RW references the Lawrence Livermore, Oct 16, 1995 report noting that pump and treat technologies are generally ineffective at reaching MCL cleanup levels. In the same paragraph the report also states that once the source of fuel hydrocarbons is removed (via soil over excavation) bioremediation processes take over. The report goes on to say that bioremediation processes are as efficient as actively engineered remediation and should be utilized whenever possible. **The U.S. EPA also acknowledges the benefits of soil removal remedial actions. "The best way to reduce the likelihood of groundwater contamination and shorten the time required to achieve remediation objectives is to quickly and completely eliminate the mass of contamination in the subsurface".**[1]

---*Significant residual volume remains in ground.* Contaminant mass calculations performed by the previous consultant are considered grossly over estimated by the present consultant.

---*Sensitive receptors nearby.* **This is an incorrect statement.** The intermittent creek identified by RW and located **1,000' NE** from the site is up gradient to this site. **Groundwater flow is to the southeast or south.**

---*SRS/PPS/Aquifer profile.* The SRS was done in 1998. This department does not know what a "PPS" or an "aquifer profile" is. If an "aquifer profile" is a geologic cross section it is more likely to be contained in a subsurface investigation report and not a CAP or RAP.


4) 76220 Commercial St. Covelo:

---*5,600 TPHg; 1,600 TPHd noted in offsite MW6 in 10/25/06 QM report.* **This is a misleading statement.** Concentrations in July '07 were 1,700 TPHg and non-detect TPHd. There has been a distinct downward trend for COC's noted in this MW since Oct 2006.

---*1,000 ethanol noted in same report.* Ethanol has been noted in the groundwater remediation system influent stream but upon subsequent re-sampling has never been detected twice. This is considered a lab QA/QC error.

---*Many sensitive receptors at risk near site.* Site ringed by active domestic wells. As a precautionary measure, ROC installed 7 well head treatment units and instituted quarterly monitoring and sampling of the wells. **COC's have not been observed in any of these wells for nearly 4 years.**

---*Extraction only recently installed.* **This is an incorrect statement.** Remediation system construction was completed in Nov 2004. ROC contracted with PG&E for power to the system in Dec, 2004. Power was not supplied until April 2005. NPDES sampling commenced in April, 2005. NCRWQCB authorized ROC to discharge under NPDES on April 4 **and issued the permit in May 2006.** System in full operation in May, 2006.

---*Large and deep plume.* **This is an incorrect statement. Onsite MW's below or near water quality objectives.** SVE and GRS systems shut down. Only offsite MW6 is impacted with HC's and those residual concentrations display a downward trend over time.

--- *Current SRS/PPS/Aquifer profiles?* The SRS was probably done in 1993. **Receptor surveys are not required to be performed unless it is noted or suspected that surrounding conditions have changed (due to construction or civic improvements for example) and receptors have been added or deleted from the original SRS.** This department does not know what a "PPS" or an "aquifer profile" is. If an "aquifer profile" is a geologic cross section it is more likely to be contained in a subsurface investigation report and not a CAP or RAP.

2

5) 105 X St., Eureka:

---*No remediation ever initiated at site.* **This is an incorrect statement.** 1,040 cubic yards (1,404 tons)* of contaminated soil has been removed via remedial action excavation. RW references the Lawrence Livermore, Oct 16, 1995 report noting that pump and treat technologies are generally ineffective at reaching MCL cleanup levels. In the same paragraph the report also states that once the source of fuel hydrocarbons is removed (via soil over excavation) bioremediation processes take over. The report goes on to say that bioremediation processes are as efficient as actively engineered remediation and should be utilized whenever possible. **The U.S. EPA also acknowledges the benefits of soil removal remedial actions. "The best way to reduce the likelihood of groundwater contamination and shorten the time required to achieve remediation objectives is to quickly and completely eliminate the mass of contamination in the subsurface".**[1]

---*Slough* only *700' downgradient.* Bioscreen Fate and Transport modeling submitted in subsurface investigation report of Aug 10, 2007 documented that contamination emanating from the onsite source area will never reach the slough. The greatest downgradient distance the plume could ever reach is 300' from the source area. At 240', the model predicted that MTBE would be present in concentrations at 3 ppb. The water quality objective dictated by the NCRWQCB for MTBE at this site is 13 ppb. In addition, based on the data collected during the subsurface investigation, the model predicts that water quality objectives onsite would be attained in 32 years. Originally the model predicted a 60 – 130 year time frame using the old input data.

--- *Current SRS/PPS/Aquifer profiles?* The SRS was probably done in 1993. **Receptor surveys are not required to be performed unless it is noted or suspected that surrounding conditions have changed (due to construction or civic improvements for example) and receptors have been added or deleted from the original SRS.** This department does not know what a "PPS" or an "aquifer profile" is. If an "aquifer profile" is a geologic cross section it is more likely to be contained in a subsurface investigation report and not a CAP or RAP.

6) 6615 Front St., Forestville:

In an e-mail dated 9/26/07, ECM Group documented a phone conversation with the Sonoma Co. Dept. of Health Services case worker. The case worker indicated that her Agency, as well as the NCRWQCB, would be willing to close the site if elevated concentrations of MTBE in offsite well MW7 were addressed and declining trends for residual concentrations could be demonstrated.

7) 830 Old Redwood Hwy., Garberville:

---*3,400 TPHg in 3/9/06 QM report.* **This is an incorrect statement.** There is no report of TPHg at this level in any of the wells in the 3/9/06 QM. The detection limit for TPHg had to be raised to 5,000 (from 50) due to the high levels of diesel in MW3. The well was non-detect for TPHg at this limit. TPHg above 3,000 ppb has not been observed in any well since June of 2002.

---*250 MTBE in MW1A in 3/9/06 report.* MTBE originates from the documented source upgradient.

---*No active remediation to date.* **This is an incorrect statement.** 1,460 cubic yards (1,971 tons)* of contaminated soil has been removed via remedial action excavation. RW references the Lawrence Livermore, Oct 16, 1995 report noting that pump and treat technologies are generally ineffective at reaching MCL cleanup levels. In the same paragraph the report also states that once the source of fuel hydrocarbons is removed (via soil over excavation) bioremediation processes take over. The report goes on to say that bioremediation processes are as efficient as actively engineered remediation and should be utilized whenever possible. **The U.S. EPA also acknowledges the benefits of soil removal remedial actions. "The best way to reduce the likelihood of groundwater contamination and shorten the time required to achieve remediation objectives is to quickly and completely eliminate the mass of contamination in the subsurface".**[1]

---*Current SRS/PPS/Aquifer profiles?* The SRS was probably done in 1993. **Receptor surveys are not required to be performed unless it is noted or suspected that surrounding conditions have changed**

3

(due to construction or civic improvements for example) and receptors have been added or deleted from the original SRS. This department does not know what a "PPS" or an "aquifer profile" is. If an "aquifer profile" is a geologic cross section it is more likely to be contained in a subsurface investigation report and not a CAP or RAP.

8) 401 Healdsburg Ave., Healdsburg:

—*Groundwater is used for domestic supply in downtown Healdsburg. 2 water supply wells are located <1,000' downgradient from site.* **This is an incorrect statement.** This comment quoted from a NCRWQCB letter dated March 2006 has been shown to be false. A subsequent DWR and door to door well search in support of the closure request showed that **there are no active domestic wells within the 1,000' radius of the site.** In fact, several wells downgradient of the site outside the 1,000' radius are contaminated with HC's from other documented unauthorized releases not associated with this site. **No receptor exists or is threatened by residual dissolved phase HC's at the site and the groundwater within a 1,000' radius is not a source of drinking water.**

—*No active remediation to date.* **This is an incorrect statement. 3,300 cubic yards (4,455 tons)\* of contaminated soil has been removed via remedial action excavation and 150,000 gallons of groundwater was treated during that excavation.** The SWRCB acknowledged that because of this remedial action ROC is now in the final stage leading up to case closure.

RW references the Lawrence Livermore, Oct 16, 1995 report noting that pump and treat technologies are generally ineffective at reaching MCL cleanup levels. In the same paragraph the report also states that once the source of fuel hydrocarbons is removed (via soil over excavation) bioremediation processes take over. The report goes on to say that bioremediation processes are as efficient as actively engineered remediation and should be utilized whenever possible. **The U.S. EPA also acknowledges the benefits of soil removal remedial actions. "The best way to reduce the likelihood of groundwater contamination and shorten the time required to achieve remediation objectives is to quickly and completely eliminate the mass of contamination in the subsurface".**[1]

—*Sensitive receptors at risk; Healdsburg relies on groundwater.* **This is an incorrect statement. Please see first comment above.**

—*Delineation vertically not completed.* **This is an incorrect statement.** Vertical extent definition was completed per NCRWQCB staff in April 2007.

—*Current SRS/PPS/Aquifer profiles?* **The SRS was updated in conjunction with the vertical delineation event in April 2007 (See first comment above).** This department does not know what a "PPS" or an "aquifer profile" is. If an "aquifer profile" is a geologic cross section it is more likely to be contained in a subsurface investigation report and not a CAP or RAP.

9) 1100 Bennett Valley Rd., Santa Rosa:

—*Free product detected recently (2004).* Free product was **drawn into the extraction wells during the first six months of operation** and continues to appear infrequently as the groundwater system operates. Free product has never been observed in any of the existing monitoring well network.

—*Domestic well in vicinity is contaminated.* **This is an incorrect statement.** The only domestic well required for sampling in the vicinity is located at 1020 Bennett Valley Rd. and has had only one COC lab result above the MCL (Dec 2000) since quarterly sampling began in June 1999. This is attributed to either field and/or lab QA/QC practices and because of the lack of recurring contaminants in the water the well is **not considered impacted by petroleum HC's.**

—*Levels in groundwater quite high.* RW cites dissolved concentrations from Dec 2006 in MW5; 49,000 TPHg and 14,000 benzene. EX4 was installed and connected to the system in May 2007 to address the area surrounding MW5. In June 2007, TPHg in MW5 was 44,000 ppb and benzene was at 7,600 ppb.

—*Current SRS/PPS/Aquifer profiles?* The SRS was done in 1999. **Receptor surveys are not required to be performed unless it is noted or suspected that surrounding conditions have changed (due to construction or civic improvements for example) and receptors have been added or deleted from**

4

the original SRS. This department does not know what a "PPS" or an "aquifer profile" is. If an "aquifer profile" is a geologic cross section it is more likely to be contained in a subsurface investigation report and not a CAP or RAP.

10) 1855 Guerneville Rd, Santa Rosa:

---*GWE not effective method of remediation.* A dual phase extraction system was in operation from Sep 1995 to Apr 1997 at which time the SVE portion of the system was shut down due to declining influent vapor concentrations and the system was operated as a groundwater extraction system only. This system was eventually **shut down in October 2004.** Assessment for secondary source material in soil in the northwest corner of the site proved correct. SVE operations were reinitiated and have **removed nearly 113 gallons of vapor equivalent HC's since February 2006.** Dissolved concentrations in **MW7 (the well nearest the secondary source) dropped from 4,300 ppb TPHg in March '06 to non-detect in May 07; benzene dropped from 130 ppb to non detect for the same time frame. For the same time frame in MW9 (next closest well), TPHg dropped from 3,300 ppb to 580 ppb and benzene from 13 ppb to non-detect.**

---*Many sensitive receptors at risk in area.* **This is an incorrect statement.** The site has been fully characterized and the shallow groundwater plume has been reduced to residual concentrations contained onsite. MTBE in the deep zones has been assessed and addressed. Domestic wells impacted with MTBE have been protected with well head treatment systems. **MTBE in impacted wells is not increasing and remains below the primary MCL of 13 ppb and the secondary MCL of 5 ppb with the exception of DW-2050.** MTBE in that well has stabilized slightly above the primary MCL at 14 - 17 ppb. However the drinking water source is municipal while the domestic well is used for irrigation.

---*Current SRS/PPS/Aquifer profiles?* The SRS was done in 1991. **Receptor surveys are not required to be performed unless it is noted or suspected that surrounding conditions have changed (due to construction or civic improvements for example) and receptors have been added or deleted from the original SRS.** This department does not know what a "PPS" or an "aquifer profile" is. If an "aquifer profile" is a geologic cross section it is more likely to be contained in a subsurface investigation report and not a CAP or RAP.

11) 1680 Mendocino Ave., Santa Rosa:
This site is **not listed in Exhibit B and is not a Redwood Oil site.**

12) 258 Roseland Ave., Santa Rosa:
Chevron is doing all assessment, investigative and remediation work at this site because of their prior petroleum handling activities there. In addition, it is **not listed in Exhibit B.**

13) 760 Sebastopol Rd., Santa Rosa:  This site is in the commingled plume account with Chevron and Tesoro, who are underwriting the majority of the cost of cleanup.

14) 4925 Sonoma Hwy., Santa Rosa:
---*Natural attenuation used here. Over-ex done.* <u>**This is an incorrect statement.**</u> **9,700 cubic yards (13,095 tons)\* of contaminated soil has been removed via remedial action excavation.** RW references the Lawrence Livermore, Oct 16, 1995 report noting that pump and treat technologies are generally ineffective at reaching MCL cleanup levels. In the same paragraph the report also states that once the source of fuel hydrocarbons is removed (via soil over excavation) bioremediation processes take over. The report goes on to say that bioremediation processes are as efficient as actively engineered remediation and should be utilized whenever possible.
**The U.S. EPA also acknowledges the benefits of soil removal remedial actions. "The best way to reduce the likelihood of groundwater contamination and shorten the time required to achieve**

remediation objectives is to quickly and completely eliminate the mass of contamination in the subsurface".[1]

In addition, an air sparge remediation system was in operation for 3 years (Sep 2001 – Nov 2004).

### 15) 455 Yolanda Ave., Santa Rosa:

---*Some active groundwater remediation in past.* **This is an incorrect statement.** **3,500 cubic yards (4,725 tons)\* of contaminated soil has been removed via remedial action excavation.** In addition, a dual phase extraction system and an air sparge system has operated since 2001. The SVE portion of the system was decommissioned in Sep 2003 and the air sparge system was shut down in April 2005. The groundwater system was deactivated in June 2007 in preparation for reconfiguring the infrastructure as an O2/O3 injection system.

### 16) 5640 Sebastopol Rd., Sebastopol:

---*Only natural attenuation implemented at site/No active remediation ever initiated at site.* **This is an incorrect statement. Approximately 2,600 cy's of contaminated soil has been removed via remedial action excavation.** RW references the Lawrence Livermore, Oct 16, 1995 report noting that pump and treat technologies are generally ineffective at reaching MCL cleanup levels. In the same paragraph the report also states that once the source of fuel hydrocarbons is removed (via soil over excavation) bioremediation processes take over. The report goes on to say that bioremediation processes are as efficient as actively engineered remediation and should be utilized whenever possible.

**In addition, a remediation system was constructed in Feb 2006. ROC contracted to have the system built in February 2004 however because of City of Sebastopol permitting procedures construction did not begin until Sept. 2005. Once the system was completed (February 2006) it took the NCRWQCB 15 months to process the NPDES discharge permit. The system was finally brought online in late July 2007.**

---*Current SRS/PPS/Aquifer profiles?* The SRS was probably done in 2000. **Receptor surveys are not required to be performed unless it is noted or suspected that surrounding conditions have changed** (due to construction or civic improvements for example) and receptors have been added or deleted from the original SRS. This department does not know what a "PPS" or an "aquifer profile" is. If an "aquifer profile" is a geologic cross section it is more likely to be contained in a subsurface investigation report and not a CAP or RAP.

### 17) 50 West Lake Mendocino Dr., Ukiah:

This site is **not listed in Exhibit B and is not a UST case with Mendocino County or the NCRWQCB.**

---*RWQCB [8/05]: Notice of Noncompliance (No annual report).* **This is an incorrect statement.** This notice pertains to the annual stormwater discharge report associated with the bulk plant, not the Redwood Oil station located at this address. The notice was sent not because there was no report submitted for the 2004 – 2005 storm season but because the report was not received by the July 1, 2005 due date. Due to a family emergency the consultant neglected to meet the due date of the report. The report was received and accepted by the Lead Agency approximately two weeks after Redwood Coast Petroleum received the non-compliance letter.

### 18) 1099 So. State St., Ukiah:

---*55,000 TPHg; 380 ethylbenzene:* These figures cited are not from any monitoring well at the site. These concentrations were discovered during a vertical extent definition event in support of closure.

---*No active remediation ever initiated at site.* **This is an incorrect statement. 1,150 cubic yards (1,552.5 tons)\* of contaminated soil has been removed via remedial action excavation.** RW references the Lawrence Livermore, Oct 16, 1995 report noting that pump and treat technologies are generally ineffective at reaching MCL cleanup levels. In the same paragraph the report also states that once the source of fuel hydrocarbons is removed (via soil over excavation) bioremediation processes take

6

over. The report goes on to say that bioremediation processes are as efficient as actively engineered remediation and should be utilized whenever possible. **The U.S. EPA also acknowledges the benefits of soil removal remedial actions. "The best way to reduce the likelihood of groundwater contamination and shorten the time required to achieve remediation objectives is to quickly and completely eliminate the mass of contamination in the subsurface".**[1]

---*Case closure req. made even though levels quite high.* **This is an incorrect statement.** Case closure was requested in Aug 2005 based on MW data at the time. The only well with any concentrations was MW 1 with 930 TPHg. The lab reports made note that this compound was a heavy end, immobile type oil and **not necessarily TPHg** even though it showed up in the gas range. **If RW is referring to the 55,000 TPHg in B-209 this data was discovered during vertical delineation work in Nov 2006, 15 months after the closure request was submitted.** ROC has subsequently submitted a work plan to install extraction wells in the area of the discovery to begin dual-phase extraction events to address this contamination.

---*Current SRS/PPS/Aquifer profiles?* The SRS was done in 1999. **Receptor surveys are not required to be performed unless it is noted or suspected that surrounding conditions have changed (due to construction or civic improvements for example) and receptors have been added or deleted from the original SRS.** This department does not know what a "PPS" or an "aquifer profile" is. If an "aquifer profile" is a geologic cross section it is more likely to be contained in a subsurface investigation report and not a CAP or RAP.

**19)** 110 No. Main St., Willits:

---*No apparent active remediation at site.* **This is an incorrect statement. 800 cubic yards (1,080 tons)* of contaminated soil has been removed via remedial action excavation.** RW references the Lawrence Livermore, Oct 16, 1995 report noting that pump and treat technologies are generally ineffective at reaching MCL cleanup levels. In the same paragraph the report also states that once the source of fuel hydrocarbons is removed (via soil over excavation) bioremediation processes take over. The report goes on to say that bioremediation processes are as efficient as actively engineered remediation and should be utilized whenever possible. **The U.S. EPA also acknowledges the benefits of soil removal remedial actions. "The best way to reduce the likelihood of groundwater contamination and shorten the time required to achieve remediation objectives is to quickly and completely eliminate the mass of contamination in the subsurface".**[1]

---*Concentrations increased from previous sampling.* **This observation/statement is insignificant and irrelevant.** Concentrations generally remained in the same order of magnitude (even if they did increase) indicating that the plume is stable and there is no increasing mass being added to the plume from a primary or secondary source.

---*Current SRS/PPS/Aquifer profiles?* The SRS was done in 1999. **Receptor surveys are not required to be performed unless it is noted or suspected that surrounding conditions have changed (due to construction or civic improvements for example) and receptors have been added or deleted from the original SRS.** This department does not know what a "PPS" or an "aquifer profile" is. If an "aquifer profile" is a geologic cross section it is more likely to be contained in a subsurface investigation report and not a CAP or RAP.

**20)** 781 So. Main St., Willits:

***14,000 TPHg; 1,400 benzene; 900 toluene; 320 ethylbenzene; 1,400 xylenes; 1,400 MTBe [9/25/2006]:*** This data is not associated with this site. **There was no sampling event on 9/25/06.** All MW's at this site are non-detect for most constituents and near MCL's for those that are not.

---*No reports in GeoTracker.* **This is an incorrect statement**. **There is only one link in GeoTracker associated with this address. All reports back to August 2005 have been submitted and appear in GeoTracker.**

---*No active remediation ever initiated at site.* **This is an incorrect statement.** **1,450 cubic yards (1,957.5 tons)\* of contaminated soil has been removed via remedial action excavation.** RW references the Lawrence Livermore, Oct 16, 1995 report noting that pump and treat technologies are generally ineffective at reaching MCL cleanup levels. In the same paragraph the report also states that once the source of fuel hydrocarbons is removed (via soil over excavation) bioremediation processes take over. The report goes on to say that bioremediation processes are as efficient as actively engineered remediation and should be utilized whenever possible. **The U.S. EPA also acknowledges the benefits of soil removal remedial actions. "The best way to reduce the likelihood of groundwater contamination and shorten the time required to achieve remediation objectives is to quickly and completely eliminate the mass of contamination in the subsurface".**[1]

---*Current SRS/PPS/Aquifer profiles?* The SRS was probably done before 1999. **Receptor surveys are not required to be performed unless it is noted or suspected that surrounding conditions have changed (due to construction or civic improvements for example) and receptors have been added or deleted from the original SRS.** This department does not know what a "PPS" or an "aquifer profile" is. If an "aquifer profile" is a geologic cross section it is more likely to be contained in a subsurface investigation report and not a CAP or RAP.

## 21) 9120 Old Redwood Hwy., Windsor:

---*Mass in soil estimates at site between 9,000kg and 27,000kg of TPHg! Assuming plume of 350' X 160', with depth of between 10' and 35' bgs, and porosity of 0.5 with concentration average of approx. 70,000ppb, TPHg mass in groundwater estimated to approx 1,800 kg.* These soil mass/groundwater mass calculations performed by the present consultant appear in the July 2004 CAP. The soil estimates were made using data from '95/'96 and are considered grossly exaggerated. Plume dimensions likewise are considered over exaggerated as well.

---*NO REMEDIATION SYSTEM HAS BEEN STARTED AT THIS SITE. No remediation ever initiated at site.* **This is an incorrect statement.** **4,000 cubic yards (5,400 tons)\* of contaminated soil has been removed via remedial action excavation.** RW references the Lawrence Livermore, Oct 16, 1995 report noting that pump and treat technologies are generally ineffective at reaching MCL cleanup levels. In the same paragraph the report also states that once the source of fuel hydrocarbons is removed (via soil over excavation) bioremediation processes take over. The report goes on to say that bioremediation processes are as efficient as actively engineered remediation and should be utilized whenever possible. **The U.S. EPA also acknowledges the benefits of soil removal remedial actions. "The best way to reduce the likelihood of groundwater contamination and shorten the time required to achieve remediation objectives is to quickly and completely eliminate the mass of contamination in the subsurface".**[1]

---*Current SRS/PPS/Aquifer profiles?* The SRS was revised in 2000. **Receptor surveys are not required to be performed unless it is noted or suspected that surrounding conditions have changed (due to construction or civic improvements for example) and receptors have been added or deleted from the original SRS.** This department does not know what a "PPS" or an "aquifer profile" is. If an "aquifer profile" is a geologic cross section it is more likely to be contained in a subsurface investigation report and not a CAP or RAP.

## 22) 2060 Eloise Dr., So. Lake Tahoe:

---*Redwood denies responsibility for PCE contaminants found in soil.* Redwood does not need to deny responsibility for PCE in soil because the site never stored or handled chlorinated solvents. PCE contamination throughout the area is well documented by LRWQCB staff. They are in the process of assigning a responsible party for the cleanup and are well aware that the PCE issue is not a result of Redwood Oil activities.

---*Current SRS/PPS/Aquifer profiles?* The SRS was probably done before 1999. **Receptor surveys are not required to be performed unless it is noted or suspected that surrounding conditions have changed (due to construction or civic improvements for example) and receptors have been added or**

8

deleted from the original SRS. This department does not know what a "PPS" or an "aquifer profile" is. If an "aquifer profile" is a geologic cross section it is more likely to be contained in a subsurface investigation report and not a CAP or RAP.

23) 1800 So. River Rd., West Sacramento:
**275 cubic yards (371 tons)\* of contaminated soil has been removed via remedial action excavation.** Onsite MW's have been non-detect for all COC's since July 2005. Case closure pending on an investigation of deep aquifer COC's emanating from the Tesoro-Arco tank farm upgradient of the site.

24) 4690 Pacific St., Rocklin: This is an old Shell Oil bulk plant, and they are underwriting the majority of the costs of cleanup.
—*13,000TPHg; 20,000TPHd; 5,700 benzene; 5,300 MTBE [4Q 06]*. **This is a misleading statement.** The 13,000 TPHg and 5,700 benzene are concentrations in EW2. In Jan 2007 concentrations were 6,100 ppb TPHg and 2,300 benzene. The 20,000 TPHD and 5,300 MTBE are concentration in the source area in MW1. In April 2007 concentrations were 23,000 ppb TPHd and 3,200 MTBE.
---*Free product found in 2006*. **Free product across the entire site was removed during a series of events designed for that purpose in the first half of 2006.** It has not been observed in any extraction or monitoring well since.
---*Sensitive receptors need to be tested*. **This is an incorrect statement. There are no sensitive receptors downgradient of the site within a 1,000' radius. In addition, the CVRWQCB has never called for sampling of any domestic well downgradient of the site.** This is because drinking water in the City of Rocklin is municipally supplied and there has never been any report of a domestic well being impacted by HC's.
---*Current SRS/PPS/Aquifer profiles?* The SRS was probably done before 1999. Receptor surveys are not required to be performed unless it is noted or suspected that surrounding conditions have changed (due to construction or civic improvements for example) and receptors have been added or deleted from the original SRS. This department does not know what a "PPS" or an "aquifer profile" is. If an "aquifer profile" is a geologic cross section it is more likely to be contained in a subsurface investigation report and not a CAP or RAP.

25 thru 29) Closed.

In addition to the cases cited by RW the following sites have also been closed by Redwood Oil for a total of eleven sites.

30) Hwy 299 & Country Club – Willow Creek
31) 1455 Beach Park Blve, Foster City
32) 1615 MacArthur Blvd. , Oakland
33) 1780 Sir Francis Drake Blvd., Fairfax
34) 1400 West Capitol Ave., Sacramento
35) 5581 Paradise Dr., Corte Madera

(1). U.S. EPA. *"How to Evaluate Alternative Cleanup Technologies for Underground Storage Tank Sites. A Guide for Corrective Action Plan Reviewers"*. Chap 9, pg 8. EPA 510-R-04-002. May 2004.

\* The total amount of cubic yards of soil removed for the sites listed in Exhibit B is: 45,595 cubic yards qualing 61,553 tons.

9